# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 2, 2014

No. 13-20159

Lyle W. Cayce
Clerk

RASHEED AL RUSHAID; AL RUSHAID PETROLEUM INVESTMENT
CORPORATION; AL RUSHAID PARKER DRILLING, LIMITED,

Plaintiffs–Appellees,

v.

NATIONAL OILWELL VARCO, INCORPORATED; NATIONAL OILWELL
VARCO, L.P.; NOW OILFIELD SERVICES, INCORPORATED; NATIONAL
OILWELL VARCO NORWAY; GRANT PRIDECO, L.P.; GRANT PRIDECO
HOLDINGS, L.L.C.; NATIONAL OILWELL NORWAY, A.S.; NOW
OILFIELD SERVICES, L.L.C.,

Defendants–Appellants.

Appeal from the United States District Court
for the Southern District of Texas

Before OWEN, SOUTHWICK, and GRAVES, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Defendants appeal the district court's denial of a motion to compel arbitration submitted by National Oilwell Varco Norway (NOV Norway). The district court denied the motion on two grounds, concluding: (1) there was no arbitration agreement and (2) NOV Norway waived any right to arbitration by substantially invoking the judicial process to the prejudice of plaintiffs. Because we conclude that there was an arbitration agreement and that NOV Norway

No. 13-20159

cannot be held responsible for the actions of its codefendants in this case, we vacate and remand.

I

In 2011, Al Rushaid Parker Drilling, Ltd. (ARPD), Rasheed al Rushaid, and Al Rushaid Petroleum Investment Corp. (collectively, plaintiffs) filed suit in Texas state court against National Oilwell Varco, Inc.; National Oilwell Varco LP (NOV LP); NOW Oilfield Services, LLC; NOV Norway; Grant Prideco, LP; and Grant Prideco Holding, LLC (collectively, defendants). The dispute arose out of various, separate contracts between ARPD and individual defendants. These contracts were formed when ARPD would send one of the defendant entities a purchase order in response to that defendant's price quotation. Under Texas law, this was sufficient to form a contract.[1]

ARPD served all of the defendants except NOV Norway by August 2011. In September of that year, defendants (with the exception of NOV Norway) removed the matter to federal court based on an arbitration clause contained in a price quotation issued by NOV LP. That clause stated that "Varco retains the right to arbitrate and any all [sic] disputes that may arise in connection with the sale of its Equipment, Product or Services." Defendants concede that the contracts with some of the other defendants did not contain arbitration provisions.

In December 2011, the district court denied plaintiffs' motion to remand. Shortly thereafter, the parties (again with the exception of NOV Norway, which had still not been served) held a scheduling conference with the district court. Considering that plaintiffs were seeking hundreds of millions of dollars, discovery would need to be conducted on multiple continents, and the trial would involve many witnesses and extend longer than two weeks, the district court set

---

[1] *See* TEX. BUS. & COM. CODE ANN. § 2.207 (West 2009); *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 803-04 (Tex. 1991).

2

a trial date of June 2013 and informed the parties that the date was firm. Following the conference, the parties engaged in pre-trial activities. Specifically, defendants moved for a more definite statement, sought protective orders, propounded interrogatories and requests for production, and moved to compel responses. According to the district court's findings, defendants "served over 400 separate document requests and 129 interrogatories" and "Plaintiff[s] reported producing over 130,000 pages of documents."

On August 14, 2012, plaintiffs served NOV Norway pursuant to the Hague Convention. After service was effected, the other defendants continued to participate in litigation in the district court, including filing a motion to enforce a consent judgment. NOV Norway, however, took steps to arbitrate, sending plaintiffs a demand to arbitrate on September 7 and including in its October 12 answer an affirmative defense that "Plaintiffs are not entitled to litigate their claims because they have agreed to arbitration." On November 19, NOV Norway moved to compel arbitration of all of the claims against all of the defendants and stay proceedings.

The premise for NOV Norway's motion was not the price quotation issued by NOV LP. Instead, it was a different price quotation, one that NOV Norway had issued to ARPD. Subsection 3.1 of NOV Norway's price quotation, titled "The ORGALIME," provides: "Terms and conditions are based on the general conditions stated in the enclosed ORGALIME S2000." The ORGALIME, in turn, provides that "[a]ll disputes arising out of or in connection with the contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce."

In March 2013, the district court denied NOV Norway's motion to compel arbitration on two grounds. First it held that there was no agreement to arbitrate because the term "based on" found in subsection 3.1 of the quotation was insufficient to incorporate the ORGALIME and its arbitration provision.

Second, the court held that NOV Norway waived any right to arbitrate by "substantially invok[ing] the judicial process" to the detriment of plaintiffs. Defendants appeal, claiming that the district court erred on both points. They further contend that, in addition to compelling arbitration, the district court should have stayed all proceedings pending the outcome of the arbitration on the ground of equitable estoppel. After the notice of appeal was filed, the district court stayed proceedings pending our decision. Title 9 U.S.C. section 16(a)(1)(C) provides that a party may seek interlocutory review of "an order . . . denying an application . . . to compel arbitration."[2]

## II

It is uncontested that the dispute at issue falls within the scope of the broad arbitration provision contained in the ORGALIME.[3] The parties' disagreement concerns whether the reference to the ORGALIME in NOV Norway's quotation was sufficient to incorporate the terms and conditions of the ORGALIME. This question is one of contract interpretation and "courts apply the contract law of the particular state that governs the agreement," which the parties in this case agree is Texas.[4] Although "there is a strong federal policy favoring arbitration, the policy does not apply to the initial determination whether there is a valid agreement to arbitrate."[5]

Under Texas law, "[a] written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and

---

[2] 9 U.S.C. § 16(a)(1)(C).

[3] *See Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1068 (5th Cir. 1998) (holding when presented with a similar arbitration clause that "it is only necessary that the dispute 'touch' matters covered by the [agreement] to be arbitrable").

[4] *Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 264 (5th Cir. 2004).

[5] *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004).

circumstances surrounding the contract's execution."[6]    Courts should "give contract terms their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning."[7]  Moreover, "courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."[8]

With respect to incorporation, the Supreme Court of Texas  has held that "[t]he language used is not important provided the document signed . . . plainly refers to another writing."[9]  Texas courts of appeals, however, have frequently held that a "mere reference" to another document is insufficient to incorporate that writing when the facts and circumstances surrounding the agreement do not indicate that incorporation was intended.[10]  One decision held that the mere mention of "General Terms and Conditions of Sale" in a contract's table of contents and as a heading was insufficient to incorporate a separate, unattached document containing the same title.[11]  Likewise, the statement that a district court's judgment was entered "pursuant to" a stipulation was insufficient to incorporate the terms of that stipulation when it was equally plausible that the

---

[6] *Hous. Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011).

[7] *Dynergy Midstream Servs., Ltd. v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).

[8] *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

[9] *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (quoting *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968)) (second alteration in original).

[10] *E.g.*, *Tribble & Stephens Co. v. RGM Constructors, L.P.*, 154 S.W.3d 639, 665 (Tex. App.—Houston [14th Dist.] 2004, pet. denied).

[11] *Trico Marine Servs., Inc. v. Stewart & Stevenson Technical Servs., Inc.*, 73 S.W.3d 545, 549-50 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

phrase was meant as "mere decretal language confirming that the judgment was decided based upon the pleadings and evidence in the case."[12]

However, when the reference to the other document is clear and the circumstances indicate that the intent of the parties was incorporation, courts have held that a document may be incorporated, even in the absence of specific language of incorporation.[13] A Texas court of appeals recently held that an instrument that referenced a separate contract six times and invited the parties to consult it incorporated that document, even though there was no language of incorporation.[14]

In the Terms & Conditions section of the NOV Norway price quotation, the subsection titled "The ORGALIME" provides: "Terms and conditions are based on the general conditions stated in the enclosed ORGALIME S2000." The district court cited two rationales in holding that this provision did not incorporate the ORGALIME. First, after examining cases interpreting "based on" and "based upon," the court concluded that the phrase does not mean "govern," but "supported by but not actually derived from." Second, the court noted that some of the provisions of the ORGALIME "overlap" with terms in the price quotation and that such overlapping is inconsistent with incorporation.

Defendants take issue with both rationales. They argue that the district court failed to give "based on" its plain meaning in this commercial context. Moreover, they contend that there is no "overlap"; rather, the price quotation

---

[12] *See Berwick v. Wagner*, 336 S.W.3d 805, 810 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (quoting *Trim v. Daniels*, 862 S.W.2d 8, 10 (Tex.App.—Houston [1st Dist.] 1992, writ denied)).

[13] *See, e.g., Gray & Co. Realtors, Inc. v. Atl. Hous. Found., Inc.*, 228 S.W.3d 431, 436 (Tex. App.—Dallas 2007, no pet.).

[14] *Id.*

departs from the ORGALIME where that document specifically contemplates variation.  We agree.

Although multiple interpretations of "based on" might be possible in the abstract, in the contract at issue only one definition of "based on" comports with its commonly understood meaning in the context of the parties' multi-million dollar purchase agreement for oil rig equipment.  The ORGALIME is a nearly 3500-word document consisting of forty-five sections of typical contractual provisions that address matters such as risk of loss, force majeure, title, and timing of delivery and payment.  The Terms & Conditions section of the NOV Norway quotation is less than 300 words and has nine subsections.  These subsections largely address issues not mentioned in the ORGALIME, such as how long the quotation remains valid and how the purchaser may obtain training.

As plaintiffs note, two of the subsections of the Terms & Conditions of the quotation establish the timing of payment and delivery, but the ORGALIME has different payment and delivery terms.  While the "Payment" section of the ORGALIME provides for payments in three installments, the quotation states that 30% of the contract must be paid ten days after the "issuance of contract" and the remaining 70% when the equipment is ready for shipment.  The ORGALIME specifically contemplates that its delivery and payment terms will only be used if the parties do not set their own terms.  The "Payment" section of the ORGALIME provides that payment should be made in thirds "[u]nless otherwise agreed."  The "Time for Delivery, Delay" section contains similar language.  The parties contemplated and contracted that absent a specific agreement regarding the details of a particular transaction, the terms of the ORGALIME were applicable.

As is common in the commercial context, the ORGALIME is designed to serve as a foundational "set of general conditions for the supply of products,

which could be used worldwide."[15] On top of this foundation, parties may add or modify terms in order to tailor the contract to their specific needs. That is the obvious purpose of the Terms & Conditions section of the quotation. It covers issues, like training, that are not addressed in the ORGALIME, and modifies issues, like timing of payment, in order to accommodate the parties' specific needs or desires in a discrete transaction.

This interpretation is further confirmed by the other language in subsection 3.1. As noted, that provision states, "Terms and conditions are based on the *general* conditions stated in the enclosed ORGALIME S2000." If "based on" simply meant "supported by," "general" would be meaningless. The word "general" has meaning only if the ORGALIME comprises the foundational, general terms of the contract and the provisions in the Terms & Conditions section are the specific terms designed to tailor the contract to this commercial context.

Because the parties' agreement reflects the ORGALIME was part of the terms and conditions of their agreement, we conclude that the district court erred in holding there was no agreement to arbitrate.

### III

Although parties may have an agreement to arbitrate, "[t]he right to arbitrate a dispute, like all contractual rights, is subject to waiver."[16] Under this circuit's precedent, a party waives its right to arbitrate if it (1) "substantially invokes the judicial process" and (2) thereby causes "detriment or prejudice" to

---

[15] EUROPEAN ENG'G INDUS. ASS'N, ORGALIME S2012 GENERAL CONDITIONS PRESENTATION (2012), http://www.orgalime.org/sites/default/files/Orgalime_S2012_presentation.pdf.

[16] *Nicholas v. KBR, Inc.*, 565 F.3d 904, 907 (5th Cir. 2009).

the other party.[17]   However, in light of the federal policy favoring arbitration, "[t]here is a strong presumption against finding a waiver of arbitration."[18]

The district court reasoned that NOV Norway's codefendants had substantially invoked the judicial process to the detriment of plaintiffs by making over 400 document requests that required the production of more than 130,000 pages in documents and engaging in substantial motion practice. Although NOV Norway did not participate in these actions, the court determined that they were attributable to NOV Norway because (a) all of the defendants are jointly owned and controlled and the same counsel represents all of them; (b) NOV Norway benefitted from the discovery; and (c) NOV Norway obtained the benefit of the judicial process by refusing informal service.

Defendants contend that the district court erred for three reasons. First, they assert that the actions of NOV Norway's codefendants were insufficient to invoke the judicial process. Second, even if they were sufficient, they did not cause plaintiffs prejudice. Lastly, the codefendants' actions cannot be attributed to NOV Norway because it is a separate juridical person. Because we agree that the actions of the other defendants cannot be attributed to NOV Norway in this case and that NOV Norway did not substantially invoke the judicial process, we need not address the other two contentions.

As discussed above, there is no dispute that NOV Norway took steps to arbitrate as soon as it was served in August 2012. Less than one month after it was served, NOV Norway sent plaintiffs a letter demanding arbitration. The following month, it stated in its answer that litigation was impermissible because of the arbitration clause. On November 19, approximately three months after being served, it officially moved to compel arbitration. Although the other

---

[17] *Miller Brewing Co. v. Fort Worth Distrib. Co.*, 781 F.2d 494, 497 (5th Cir. 1986).

[18] *Republic Ins. Co. v. PAICO Receivables, LLC*, 383 F.3d 341, 344 (5th Cir. 2004).

defendants continued their litigation activities during this time, there is no indication that NOV Norway participated in any of these actions. NOV Norway did not invoke the judicial process at all, much less substantially. NOV Norway did not waive its right to arbitrate unless the actions of its codefendants are attributable to it.

Our court has yet to address when, if ever, the actions of an arbitration proponent's codefendants may be imputed to that proponent for the purposes of determining waiver. At least two other courts, however, have confronted the issue. They have held that the actions of an arbitration proponent's affiliates may be imputed to the proponent for the purposes of determining waiver when principles of agency or corporate law, such as the alter ego doctrine, would counsel such imputation.[19] These holdings are consistent with this court's other jurisprudence on both arbitration and waiver. Both this court and the Supreme Court have held that principles of agency and contract law should be applied to determine whether an affiliate's agreement to arbitrate can bind a nonsignatory.[20] Similarly, this court has held that a corporation can be bound by its affiliate's waiver of personal jurisdiction if the alter-ego or successor-corporation doctrine would impute the affiliate's actions to the corporation.[21]

In holding that the actions of NOV Norway's proponents could be attributed to it, however, the district court did not apply these principles. Instead, it articulated other reasons for attributing the codefendants' actions to

---

[19] *See Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 456-57 (2d Cir. 1995) (holding that actions of proponent's affiliates could be imputed to proponent if the affiliates "were mere alter egos" of the proponent); *Yates v. Doctor's Assocs., Inc.*, 193 Ill. App. 3d 431, 440 (Ill. App. Ct. 1990) (holding actions of affiliate attributable to proponent since affiliate was "at least its agent").

[20] *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-32 (2009); *Rice Co. (Suisse), S.A. v. Precious Flowers Ltd.*, 523 F.3d 528, 537-38 (5th Cir. 2008).

[21] *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 654 (5th Cir. 2002).

No. 13-20159

NOV Norway, namely that (a) it shared ownership and counsel with the codefendants; (b) it benefitted from its codefendants' discovery in the district court; and (c) it facilitated the lengthy discovery process by refusing informal service. These facts are not determinative, either in isolation or in combination. Punishing a defendant for refusing to accept informal service flies in the face of Federal Rule of Civil Procedure 4. That Rule specifically requires that "[a] summons . . . be served with a copy of the complaint," even when the defendant cannot be served within the United States.[22] Although we have counseled flexibility in determining whether a plaintiff has timely served a foreign defendant, we have by no means dispensed with the requirement.[23] Were we to now punish a defendant for exercising its right to require service under Rule 4, we would practically obliterate the requirement, as defendants with arbitration clauses would have to accept informal process in order to maintain their right to arbitrate.

Attributing the actions of an arbitration proponent's codefendants to it simply because it benefitted from those actions would cast an unduly wide net. As defendants note, a defendant joined after litigation has started often benefits from the litigation activities that have been conducted up to that point. To deprive a party of its right to arbitrate merely because of those benefits would not be reasonable if the party was not responsible for the litigation activities.

Imputing to a party the actions of its codefendants merely on the ground that the entities are jointly owned or controlled or share representation would

---

[22] FED. R. CIV. P. 4(c), (f); *Lozano v. Bosdet*, 693 F.3d 485, 489 (5th Cir. 2012) (explaining that the district court may dismiss a complaint when it "determines in its discretion that the plaintiff has not demonstrated reasonable diligence in attempting service").

[23] *See Lozano*, 693 F.3d at 488-89 (declining to adopt Ninth Circuit's holding that plaintiff has unlimited time to serve a defendant).

contravene the fundamental principle of corporate separateness.[24]  We decline to wholly depart from this principle and impute to a party the actions of its corporate affiliates without regard to the entities' separate corporate statuses.[25]

There has been no showing that NOV Norway was the alter ego of its affiliates or that there were grounds to pierce the defendants' corporate veils. Only then would it be appropriate to hold NOV Norway responsible for its codefendants' actions.  No evidence in the record supports the conclusion that NOV Norway is the alter ego or that veil-piercing is appropriate.

Similarly, under Texas law, "the limitation on liability afforded by the corporate structure can be ignored only when the corporate form has been used as part of a basically unfair device to achieve an inequitable result."[26]  This includes "when the corporate structure has been abused to perpetuate a fraud, evade an existing obligation, achieve or perpetuate a monopoly, circumvent a statute, protect a crime, or justify wrong."[27]  Moreover, the Supreme Court of

---

[24] *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries.") (internal quotation marks omitted). FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS, § 25 (2013) ("The fact that two or more corporations have the same shareholders or officers, or both, does not destroy their character as distinct entities; nor does similarity or identity in names make two corporations the same, particularly where they are incorporated in different states."); *see also Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999) ("Courts have long presumed the institutional independence of related corporations, such as parent and subsidiary, when determining if one corporation's contacts with a forum can be the basis of a related corporation's contacts."); *Sims v. Sims (In re Sims)*, 994 F.2d 210, 217 (5th Cir. 1993) (applying the principle of corporate separateness in bankruptcy proceedings).

[25] NEIL A. HELFMAN, 114 AM. JUR. PROOF OF FACTS 403 § 3 (3d ed. 2010) ("Because limited liability holds such an esteemed place in our jurisprudence, courts have cautioned not to dispense with it lightly and that a corporation's identity should be disregarded with great caution and not precipitately.") (internal citations and quotation marks omitted).

[26] *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2009) (internal citations and quotation marks omitted).

[27] *Id.*

No. 13-20159

Texas  has "never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances.  There must also be evidence of abuse."[28]

Although plaintiffs baldly aver that NOV Norway and its affiliates have sought to cause delay and expense, there is no evidence in the record that NOV Norway has abused its corporate form.  It merely declined to become a party to litigation without being formally served.  That is not the sort of "unjust" or "inequitable" action that warrants disregarding the principle of corporate separateness.[29]  Accordingly, we hold that the district court erred in concluding that NOV Norway waived its right to arbitrate.

**IV**

As we conclude that the district court erred, any claims against NOV Norway by ARPD should be submitted to arbitration, as those were the two parties to the arbitration agreement.  Our conclusion does not, however, necessarily require the district court to compel any of the other parties to arbitrate their dispute or to stay proceedings.  "In order to be subject to arbitral jurisdiction, a party must generally be a signatory to a contract containing an arbitration clause."[30]  The only signatories to the agreement at issue in this appeal were ARPD and NOV Norway.  The defendants, however, ask this court to hold that the doctrine of equitable estoppel requires the district court to stay all proceedings pending the outcome of arbitration.

---

[28] *Id.* at 455.

[29] *Id.* ("By 'injustice' and 'inequity' we do not mean a subjective perception of unfairness by an individual judge or juror; rather these words are used . . . as shorthand references for the kinds of abuse, specifically identified, that the corporate structure should not shield—fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like.").

[30] *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 353 (5th Cir. 2003).

No. 13-20159

We decline to do so. "[W]hether to utilize equitable estoppel . . . is within the district court's discretion."[31] When a district court fails to exercise its discretion based on a "misapprehension of the law" as was the case here, this court remands the action to allow the "district court to exercise [it] in the first instance."[32] Accordingly, we remand the issue of whether to stay the proceedings concerning the other parties to the district court.

*     *     *

The district court's denial of NOV Norway's motion to compel is VACATED. The case is REMANDED to the district court to decide whether to stay proceedings concerning the other parties under the doctrine of equitable estoppel.

---

[31] *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

[32] *Duffy & McGovern Accommodation Servs. v. QCI Marine Offshore, Inc.*, 448 F.3d 825, 831 (5th Cir. 2006).

14