PER CURIAM:
This ease is the latest in a number of appeals arising from the collapse of Allen Stanford’s massive Ponzi scheme. Ralph Janvey, the Receiver for the Stanford entities, seeks to use the Texas Uniform Fraudulent Transfer Act to take back money paid to employees of various Stanford entities. The district court denied these employees’ motions to compel arbitration based on arbitration agreements included in the terms of contracts with the Stanford Group Company. We AFFIRM.
I.
R. Allen Stanford created a large network of interconnected companies that sold certificates of deposit to investors through the Stanford International Bank, Ltd. (the “Bank”). These certificates of deposit promised favorable returns and drew over $7 billion in investments in the *237 nearly ten years that the scheme operated. Stanford generated the promised returns not by wisely managing the investors’ money but by using payments from new investors to cover the gains paid to older investors — a classic Ponzi scheme. Stanford and his Chief Financial Officer, James Davis, pleaded guilty to a number of federal offenses and are currently incarcerated.
In an effort to unwind the scheme, the Securities and Exchange Commission sued Stanford, the Stanford Group Company (the “Company”), and numerous other Stanford entities. At the SEC’s request, the district court appointed Janvey as Receiver and “charged him with preserving corporate resources and recovering corporate assets that had been transferred in fraudulent conveyances.” Janvey v. Brown, 767 F.3d 430, 433 (5th Cir. 2014).
The Receiver sued a large group of individuals who profited from the Stanford scheme and froze assets in Stanford entity accounts tied to those individuals. The district court severed the Receiver’s claims against investor-defendants from the Receiver’s claims against employee-defendants. This court has dealt separately with various claims against the investor-defendants and they are not at issue here.[1]
The defendants in the present action all previously worked in various capacities for the Stanford enterprises and received salary, commissions, bonuses, or later-forgiven loans from the Stanford entities.
Shortly after the Receiver initiated his claims against these former employees, they moved to compel arbitration. The motions to compel arbitration relied on arbitration agreements between the Company or Stanford Group Holdings, Inc. (another Stanford entity) and the former employees.[2] The agreements were contained in: (1) promissory notes between the defendants and the Company that governed the upfront loan payments that the Company awarded to the defendants when they joined Stanford; (2) the broker-dealer forms that the Company submitted to the Financial Industry Regulation Authority (FINRA) when registering the employee-defendants as brokers; (3) FINRA’s internal rules governing disputes between brokers and their employers; and (4) Stanford Group Holdings, Inc.’s Performance Appreciation Rights plan. The arbitration clauses in the promissory notes provide that: “any controversy arising out of or relating to this Note, or default on this Note, shall be submitted to and settled by arbitration pursuant to the constitution, by-laws, rules and regulations of the National Association of Securities Dealers (NASD)....”[3] The other arbitration clauses are materially indistinguishable for purposes of this case.
While the motions to compel arbitration were pending, the district court issued a preliminary injunction preventing the employees from accessing the frozen assets. The defendants challenged the injunction in an interlocutory appeal. We held that: *238 (1) the district court had power to consider the preliminary injunction before deciding the motion to compel arbitration; (2) the district court did not abuse its discretion by issuing the preliminary injunction; (3) the preliminary injunction was neither an attachment nor overly broad; and (4) although the district court had not yet ruled on the motion to compel arbitration, the Receiver’s claims were not subject to the arbitration agreement because the Receiver was suing not on behalf of the Stanford entities, but rather on behalf of creditors who were not parties to the arbitration agreements. Janvey v. Alguire (Alguire I), 628 F.3d 164, 185 (5th Cir. 2010). We then withdrew that opinion and replaced it with another opinion that repeated the first three holdings but concluded that we lacked jurisdiction over the still-pending motion to compel arbitration and remanded to the district court for consideration of the motion in the first instance. Janvey v. Alguire (Alguire II), 647 F.3d 585, 605 (5th Cir. 2011).
The district court, although not bound by our decision in Alguire I, agreed with its reasoning and denied the motions to compel arbitration. As we had in Alguire I, the district court reasoned that the Receiver’s claims, brought on behalf of third-party creditors, were not affected by the promissory notes between the defendants and the Company. Janvey v. Alguire, No. 3:09-cv-724, 2011 WL 10893950, at *4 (N.D. Tex. Aug. 26, 2011).
While the appeal from that decision was pending, we held in another Stanford scheme appeal that the Receiver represented the creditors, not the Stanford entities. Janvey v. Democratic Senatorial Campaign Committee, Inc. (DSCC I), 699 F.3d 848 (5th Cir. 2012). We withdrew that opinion and issued another, concluding instead that:
[A] federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities’ investor-creditors, but the knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations. Thus, once freed of his coercion by the court’s appointment of a receiver, the corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted' to third parties without receiving reasonably equivalent value.
Janvey v. Democratic Senatorial Campaign Committee, Inc. (DSCC II), 712 F.3d 185, 190 (5th Cir. 2013). This holding invalidated the basis for the district court’s denial of the motions to compel arbitration. As a result, we vacated the denial of the motion to compel and remanded once again for the district court to reconsider the motions in light of DSCC II. Janvey v. Alguire (Alguire III), 539 Fed.Appx. 478, 480-81 (5th Cir. 2013).
The district court once again denied the motions to compel, resting its result on three major conclusions. First, the district court rejected the Receiver’s argument that he can choose the Stanford entity on whose behalf he sues, instead requiring the Receiver to sue on behalf of the Company, which was party to the arbitration agreements. Janvey v. Alguire (Denial Order), No. 3:09-cv-724, ECF No. 1093, at 9-10 (N.D. Tex. July 30, 2014) (order denying motions to compel arbitration).
Second, the district court concluded that the Receiver had rejected the arbitration agreements and that such rejection was permissible. Id. at 16-25. The district court, drawing from well-established bankruptcy law, determined that an equity receiver, like a bankruptcy trustee, has the *239 power to assume or reject any executory, contract. The district court concluded that executory arbitration agreements are analyzed as separable from the contracts in which they are contained. Turning to the arbitration agreements in this case, the district court rejected the defendants’ argument that the Receiver had not rejected the agreements, noting that federal equity receivers have no obligation to affirmatively reject an executory contract. The district court determined that the Receiver’s rejection of the arbitration agreements was permissible, explaining that it would be “unjust and inequitable” to burden and deplete the receivership estate by requiring the Receiver to adopt the arbitration agreements.
Finally, the district court concluded in the alternative that arbitration of the Receiver’s claims would conflict with the central purposes and objectives of the federal equity receivership statutory scheme, and therefore exercised its discretion to deny the motions to compel arbitration. Id. at 26-49. The district court noted that in the receivership statutes Congress had “clearly emphasized the importance of consolidating in one court all matters involving the receivership estate and assets,” that courts have consistently held that Congress intended for federal equity receivers to be utilized in situations involving federal securities laws, and that the federal multi-district litigation scheme implicated in this receivership also emphasizes consolidation before one court. Id. at 33-36. Drawing from case law involving conflicts between the purposes of the Bankruptcy Code and the Federal Arbitration Act .(FAA), the district court concluded that
a specific conflict arises between arbitrating the Receiver’s fraudulent transfer claims under the Employee Defendants’ arbitration agreements and certain central purposes of the federal equity receivership statutory framework, especially in the added context of the Stanford receivership being a multidistrict litigation SEC receivership over a Ponzi scheme.
Id. at 41. Considering that “[arbitration decentralizes, deconsolidates, strips the court and the receiver of exclusive jurisdiction over the receivership assets, interferes with the broad powers of both the court and the .receiver to adjudicate all issues affecting receivership assets,” id. at 46, and interferes with equal distribution of assets, the' district court exercised its discretion to deny the motions to compel arbitration. Id. at 47-49.
In separate orders, the district court denied motions to compel arbitration filed by Juan Rincon (the former Executive Vice President and Chief Financial Officer of the Company),[4] Luis Giusti (a former member of the Bank’s advisory board),[5] and Oreste Tonarelli (a former managing director of the Company’s Private Clients Group).[6] The. defendants appeal and their appeals were consolidated.
*240 II.
We have jurisdiction to consider this appeal even though the district court’s denials of the motions to compel arbitration are interlocutory orders. In re Mirant Corp., 613 F.3d 584, 588 (5th Cir. 2010). We review the denial of a motion to compel arbitration de novo, but we review the district court’s factual findings for clear error. Id.
“[Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.” United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). As a result, we analyze whether a party can be compelled to arbitrate using a two-step process. “First, we ask if the party has agreed to arbitrate the dispute.” Sherer v. Green Tree Serv. L.L.C., 548 F.3d 379, 381 (5th Cir. 2008). “While there is a strong federal policy favoring arbitration, the policy does not apply to the initial determination whether there is a valid agreement to arbitrate.” Banc One Acceptance Corp. v. Hill, 367 F.3d 426, 429 (5th Cir. 2004). If the party opposing arbitration has agreed to arbitrate, “we then ask if ‘any federal statute or policy renders the claims nonarbitra-ble.’ ” Sherer, 548 F.3d at 381 (quoting JP Morgan Chase & Co. v. Conegie, 492 F.3d 596, 598 (5th Cir. 2007)).
III.
The Receiver argues that he is bringing his claims on behalf of the Bank, which has not agreed to arbitrate with the defendants, except in the case of Giusti. In the alternative, the Receiver argues that the arbitration agreements on which the defendants’ motions are based should be rejected as part of the fraudulent scheme, and that his equitable authority as Receiver empowers him to reject executory contracts, including the arbitration clauses. Finally, the Receiver argues there is “an inherent conflict between arbitration and the [federal receiver] statute’s underlying purpose” such that federal law does not permit the court to compel arbitration. Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 227, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). The various defendants disagree and also argue that the district court exceeded the scope of our mandate in Alguire III by allowing the Receiver to avoid arbitration.[7]
A.
The Receiver first argues that he is free to bring his TUFTA claims on behalf of any of the Stanford entities and that, by bringing the claims on behalf of the Bank, which was not a signatory to the arbitration agreements (except for the agreement with Giusti), he is not bound by the arbitration agreements. The district court disagreed, reasoning that allowing the Receiver to pick the entity on whose behalf he brought the claims “would be inconsistent with [the district court’s] previous rulings and inconsistent with equity.” Denial Order at 10.[8]
*241 We have previously considered at great length the Receiver’s representative role. In DSCC II we concluded that the Receiver “has standing to assert the claims of [the Bank], and any other Stanford entity in receivership.” 712 F.3d at 192. We clarified, however, that “the knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations.” Id. at 190. Therefore, “once freed of his coercion by the court’s appointment of a receiver, the corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted to third parties....” Id. We based our decision in that case on the Seventh Circuit’s holding in Scholes that corporations involved in a' fraudulent scheme, although “[the defrauder’s] robotic tools, were nevertheless in the eyes of the law separate legal entities with rights and duties.” Scholes v. Lehmann, 56 F.3d 750, 754 (7th Cir. 1995).
Scholes, like DSCC II, determined that a receiver has standing to sue on behalf of formerly captive corporations and that the corporations, once freed from the control of the scheme’s perpetrator, are' not barred from recovery by the defense of in pan delicto. Id. at 754-55; DSCC II, 712 F.3d at 191-92. Although these cases do not directly answer our question, their reasoning compels a single outcome. If the corporations retain identities distinct from Stanford himself, as “separate legal entities with rights and duties,” it logically follows that they are distinct from one another. Scholes, 56 F.3d at 754. Now that Stanford no longer controls the Bank and the Company for the benefit of an integrated criminal' scheme, the Bank and the Company are separate actors. The Receiver, appointed by the court to represent all of the Stanford entities, may bring his claim on behalf of whichever of the entities he chooses, provided that the entity has a claim against the defendant in question.
The Receiver has exercised his authority to bring claims on behalf of the Stanford entities individually and argues that he brings his claims against the employee-defendants on behalf of the Bank. The Bank collected deposits from investors. The Receiver alleges that Stanford diverted those deposits from the Bank into the Company and then arranged for the Company to pay the employee-defendants in furtherance of his illegal scheme. These allegations satisfy the requirements of TUFTA, which allows any creditor to reclaim fraudulently transferred assets from the initial transferee (here the Company) or “any subsequent transferee other than a good faith transferee who took for value.” Tex. Bus. & Comm. Code § 24.009. The Bank, which has a “right to payment or property,” is a creditor under TUFTA. Id. § 24.002(3), (4). TUFTA thus allows the Receiver to bring a claim on behalf of the Bank against the defendants as “subsequent transferee^” of the fraudulent transfers.[9]
*242 The Bank is not a signatory to any of the promissory notes apart from Gi-usti’s, nor is it a member or associated person bound to arbitrate under FINRA’s rules. Moreover, the references to “affiliates” in the arbitration agreements are insufficient to bind the Bank. See In re Merrill Lynch Trust Co. FSB, 235 S.W.3d 185, 191 (Tex. 2007) (“ ‘A corporate relationship is generally not enough to bind a nonsignatory to an arbitration agreement.’ Unlike a corporation and its employees, corporate affiliates are generally created to separate the businesses, liabilities, and contracts of each. Thus, a contract with one corporation — including a contract to arbitrate disputes — is generally not a contract with any other corporate affiliates.”) (citations omitted) (declining to allow affiliates referenced in arbitration agreement to compel arbitration in the absence of an “alter-ego exception”). Because the Receiver brings his claims on behalf of the Bank and the Bank has not consented to arbitration, the motions to compel arbitration fail.
The defendants’ arguments to the contrary are unavailing. They argue that three different equitable doctrines bind the Bank as a third party to the arbitration agreements between the Company and the defendants: alter ego, estop-pel, and third-party beneficiary. These doctrines permit a court to impose a contract on a third party who is not a signatory to the contract. See Bridas S.A.P.I.C. v. Gov’t of Turkmenistan, 345 F.3d 347, 356, 358-63 (5th Cir. 2003). These three doctrines sound in equity. We do not apply equitable principles rigidly, but rather circumspectly, because they are “grounded in fairness_‘In all cases, the lynchpin ... is equity, and the point of applying it to compel application of a contractual provision is to prevent a situation that would fly in the face of fairness.’ ” Bahamas Sales Assoc., L.L.C. v. Byers, 701 F.3d 1335, 1342 (11th Cir. 2012) (alterations and citation omitted). None of the three doctrines bind the Bank.
The doctrine of alter ego allows a court to pierce the corporate veil and impose on an owner the obligations of its subsidiary “when their conduct demonstrates a virtual abandonment of separateness.” Bridas, 345 F.3d at 359 (quoting Thomsom-CSF, S.A. v. Am. Arbitration Ass’n, 64 F.3d 773, 777 (2d. Cir. 1995)). “Courts do not lightly pierce the corporate veil even in deference to the strong policy favoring arbitration.” Id. (quoting ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1461 (10th Cir. 1995)). In prior litigation, we have made clear that the blurring of corporate boundaries and the wrongful acts taken by Stanford no longer equitably affect the hostage corporations now that they are under the control of the Receiver. See DSCC II, 712 F.3d at 192. Just as Stanford’s removal from the scene vitiated the defendants’ defense of in pari delicto, so it vitiates their defense of alter ego.
The defendants advance two theories of equitable estoppel, both of which are inapplicable. The “intertwined claims” theory governs motions to compel arbitration when a signatory-plaintiff brings an action against a nonsignatory-defendant asserting claims dependent on a contract that includes an arbitration agreement that the defendant did not sign. Grigson v. Creative Artists Agency, L.L.C., 210 F.3d 524, 527-28 (5th Cir. 2000). It does not govern the present ease, where a signatory-defendant seeks to compel arbitration with a nonsignatory-plaintiff. Bri-das, 345 F.3d at 361. The “direct benefits” theory of equitable estoppel “prevents a nonsignatory from knowingly exploiting an agreement containing the arbitration clause.” Graves v. BP Am., Inc., 568 F.3d 221, 223 (5th Cir. 2009). That is, “a nonsig-natory cannot sue under an agreement *243 while at the same time avoiding its arbitration clause.” Id. This theory is inapplicable here because the Receiver does not seek to enforce the various contracts containing the arbitration agreements; rather, he seeks to unwind them and reclaim the benefits fraudulently distributed to the defendants under the contracts.
Finally, the third-party beneficiary doctrine prevents the intended beneficiary of a contract from avoiding the terms of the contract. It does not apply when a person merely is directly affected by the parties’ conduct or has a substantial interest in a contract’s enforcement. Bridas, 345 F.3d at 362. Rather, “[p]arties are presumed to be contracting for themselves only,” and a third party is bound only “if the intent to make someone a third-party beneficiary is ‘clearly written or evidenced in the contract.’” Id. (citing Fleetwood Ent., Inc. v. Gaskamp, 280 F.3d 1069, 1075-76 (5th Cir. 2002)). There is no indication in the contracts or promissory notes that the Company and the defendants intended the Bank to be the beneficiary of their agreements. The defendants argue that the inflated commissions paid to them under the contracts benefited the Bank because they induced more creditors to invest in the Bank, but this argument conflates Stanford with his victim corporations. Expanding the number of defrauded investors in the Bank merely expanded the Bank’s ultimate liabilities and increased the injury to the Bank; it did not benefit the Bank as a corporate entity distinct ■from'the fraudster, Stanford. See Warfield v. Byron, 436 F.3d 551, 560 (5th Cir. 2006) (“It takes cheek to contend that in exchange for the payments [an investor and promoter] received, the RDI Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments.”).
Because the Receiver may sue on behalf of any of the Stanford entities that has a claim against the defendants, because he has chosen to sue on behalf of the Bank, which has not consented to arbitrate claims against any of the defendants, except Giusti, and because none of the equitable doctrines urged by the defendants applies, the Receiver cannot be compelled to arbitrate his claims against these defendants.
We also conclude, though on different grounds, that the Receiver cannot be compelled to arbitrate its claims against Giusti, who did enter into an agreement to arbitrate with the Bank.[10] A party who has entered into an agreement to arbitrate must insist on this right, lest it be waived. “Under this circuit’s precedent, a party waives its right to arbitrate if it (1) substantially invokes the judicial process and (2) thereby causes detriment or prejudice to the other party.” Al Rushaid v. Nat’l Oilwell Varco, Inc., 757 F.3d 416, 421 (5th Cir. 2014) (internal quotation marks omitted). While waiver should not be inferred lightly, we conclude that Giusti’s conduct in this case clears the waiver threshold. After the Receiver sued Giusti in 2011, Giusti participated in discovery and other pre-trial litigation.[11] Giusti ultimately moved to compel arbitration in *244 2014, and continued to litigate while that motion was pending. See In re Mirant Corp., 613 F.3d at 589-91 (holding that a party substantially invoked the judicial process by, inter alia, submitting three motions to dismiss before moving to compel arbitration). One- of the primary justifications for enforcement of private dispute resolution is the avoidance of large litigation costs, including discovery. Parties cannot enjoy the benefits of federal discovery, and then, after doing so, seek to enforce a decision through private resolution. We therefore conclude that Giusti substantially invoked the judicial process.
We also conclude that Giusti’s participation in the judicial process prejudiced the Bank. In re Mirant Corp., 613 F.3d at 591 (“In addition to invocation of the judicial process, the party opposing arbitration must demonstrate prejudice before we will find a waiver of the right to arbitrate.”). Prejudice, in this context, “refers to delay, expense, and damage to a party’s legal position.” Id. It is apparent on the face of the record before us that the Bank was prejudiced, both by delay and increased litigation expenses, as a result of Giusti’s decision to litigate for nearly three years before moving to compel arbitration. Therefore, we conclude that Giusti has waived his right to arbitration, and so the Receiver cannot be compelled to arbitrate its claims against him.
Accordingly, we conclude that the Receiver cannot be compelled to arbitrate its claims against any of the defendants.
B.
The Receiver also argues that these particular arbitration agreements are additionally unenforceable because they were instruments of the fraud inasmuch as the privacy they provided facilitated the fraud and because the Stanford entities were coerced into accepting them by Stanford as part of his Ponzi scheme.[12] As a result, the Receiver argues that, under the logic of DSCC II, the Company cannot be bound to them now that Stanford is removed from the scene unless the Receiver affirmatively assents to them, and that enforcement of the arbitration agreements would give effect to the very fraud the Receiver is charged with unwinding by diminishing his ability to return fraudulently transferred assets to the creditors. The Receiver makes a strong argument that if we hold that he is bound by the terms of the contracts involved in Stanford’s Ponzi scheme, there would be no basis for recovering the funds that were fraudulently transferred to the scheme’s net winners pursuant to their employment contracts. We need not reach this issue as we have already determined, on other grounds, that the Receiver cannot be compelled to arbitrate its claims against any of the defendants.
*245 Nor do we reach the Receiver’s similar but broader policy argument that the underlying purpose of the federal equity receivership statutes is at odds with the FAA’s mandate in favor of arbitration. In support of this alternative basis for denying the motions to compel arbitration, the district court raised important concerns about undermining Congress’s goal of consolidating receivership claims before a single court. However, we are wary of endorsing these broad policy arguments in the absence of specific direction from the Supreme Court. Cf., e.g., DIRECTV, Inc. v. Imburgia, — U.S.-, 136 S.Ct. 463, 471, 193 L.Ed.2d 365 (2015) (rejecting interpretation of law that “does not give ‘due regard ... to the federal policy favoring arbitration’ ”) (quoting Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 476, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)).[13]
C.
Finally, we reject the arguments raised by some of the defendants that the district court’s order exceeded the scope of our mandate in Alguire III. “We review de novo a district court’s application of the remand order, including whether the law-of-the-case doctrine or mandate rule forecloses the district court’s actions on remand.” United States v. Teel, 691 F.3d 578, 583 (5th Cir. 2012) (citation omitted).
In Alguire III, we stated:
On appeal, the parties have focused primarily on whether the Receiver has standing to sue on behalf of creditors and not on whether he is bound by the arbitration clauses if he sues, as he must, on behalf of the Stanford Entities. The district court did not address this issue. We therefore remand to allow the district court to consider that question in the first instance.
539 Fed.Appx. at 480. Whether the Receiver is bound by the arbitration clauses if he sues on behalf of the Stanford entities (which includes the Bank) is precisely the question argued by the Receiver and answered by the district court, according to our instruction. We see no violation of the mandate rule.
Nor has the Receiver waived his arguments raised for the first time in the district court, because those arguments were made in response to our mandate that the district court consider a new issue in the first instance. Moreover, the reason for the remand in Alguire III was that DSCC II effected an intervening change in the law governing the Receiver’s standing to sue on behalf of non-receivership entities. Before DSCC II, there was no need for the Receiver to raise his current arguments as to why, when suing on behalf of the receivership entities, he is not bound by the arbitration agreements. Under these circumstances, the Receiver properly raised new arguments to address the new question before the district court.[14]
IV.
Because the Receiver properly brings his TUFTA claims on behalf of the Stan *246 ford International Bank, which did not consent to arbitration with any of the defendant employees, other than Giusti, it cannot be compelled to arbitrate with those defendants. Moreover, because Gi-usti waived his right to arbitration, the Receiver cannot be compelled to arbitrate its claims against him either. Accordingly, we AFFIRM the district court’s denial of the defendants’ motions to compel arbitration.

.A more exhaustive factual background can be found in other cases involving the Stanford Ponzi scheme. See, e.g., United States v. Stanford, 805 F.3d 557, 563-65 (5th Cir. 2015), cert denied,-U.S. -, 137 S.Ct. 491, 196 L.Ed.2d 402 (2016); Brown, 767 F.3d at 432-34; Janvey v. Democratic Senatorial Campaign Committee, Inc., 712 F.3d 185, 188-89 (5th Cir. 2013); Janvey v. Alguire, 647 F.3d 585, 589-91 (5th Cir. 2011); Janvey v. Adams, 588 F.3d 831, 833-35 (5th Cir. 2009).

. One of the employee-defendants, Luis Gi-usti, signed an arbitration agreement in which the Bank was the counterparty.

. Later arbitration agreements required arbitration governed by the rules of FINRA, the successor to NASD.

. Janvey v. Rincon, No. 3:11-cv-1659, ECF No. 44 (N.D. Tex. Aug. 29, 2014) (order denying motion to compel arbitration). The district court concluded that Rincon had waived his right to arbitration and, in the alternative, concluded that his motion would fail for the same reasons expressed in the Denial Order.

. Janvey v. Giusti, No. 3:11-cv-292, ECF No. 116 (N.D. Tex. Sept. 23, 2014) (order denying motion to compel arbitration). The district court denied the motion on the grounds expressed in the Denial Order.

.Janvey v. Tonarelli, No. 3:10-cv-1955, ECF No. 43 (N.D. Tex. Aug. 1, 2014) (order denying motion to dismiss or, in the alternative, to compel arbitration). The district court again denied the motion on the grounds expressed in the Denial Order.

. The various defendants have collectively filed ten initial briefs and six reply briefs, and there is substantial overlap in their arguments. Except where otherwise noted, we refer to the defendants collectively without distinguishing between their arguments.

. The district court also observed that certain difficulties might arise if the Receiver brought actions on behalf of the Bank, because the Receiver would have to challenge two fraudulent transfers: first, the transfer of funds from the Bank to the Company and, second, the transfer from the Company to the employee-defendants. The district court stated that although TUFTA permits claims against subsequent transferees, Tex. Bus. & Comm. Code § 24.009(b)(2), the Receiver would need to *241 show that the first transfer was fraudulent and would have to do so while representing both sides of the transaction (the Bank and the Company).

. Wiand v. Schneiderman, 778 F.3d 917 (11th Cir. 2015); on which the defendants rely for the proposition that a receiver cannot avoid arbitration by asserting claims on behalf of non-signatory receivership entities, is distinguishable on this ground. Wiand held that where the non-signatory entities had "no relationship at all with [the defendant],” they had no standing to pursue standalone claims against the defendant so as to provide an avenue for vacating an arbitration award. Id. at 925. Here, in contrast, the Bank has standing under TUFTA to bring its claims directly against the defendants.

. Though the district court did not resolve Giusti’s motion to arbitrate on these grounds, we may affirm the district court on any ground "presented by the parties,” even if not "relied on by the [district] court.” See Resolution Performance Prod.., LLC v. Paper Allied Indus. Chem. & Energy Workers Int’l Union, Local 4-1201, 480 F.3d 760, 767 n.20 (5th Cir. 2007); Bickford v. Int'l Speedway Corp., 654 F.2d 1028, 1031 (5th Cir. 1981) (district court may be affirmed “on any grounds, regardless of whether those grounds were used by the district court”).

. For instance, Giusti moved to dismiss, filed an initial answer and amended answer, sent written discovery, and answered discovery.

. The defendants counter that the validity of the arbitration clause is a question for the arbitrator because "where parties have formed an agreement which contains an arbitration clause, any attempt to dissolve that agreement by having the entire agreement declared voidable or void is for the arbitrator.” Will-Drill Res., Inc. v. Samson Res. Co., 352 F.3d 211, 218 (5th Cir. 2003). However, the Receiver does not, at this stage, argue that the entirety of the contracts between the employee-defendants and the Company are void. Although he will undoubtedly argue that proposition as part of the litigation on the merits, at the moment he merely argues that arbitration provisions, standing on their own as severable provisions of the contract, are void. “[A] gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability’ for a court to decide.” Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002).

. Likewise, we do not reach the parties’ various other arguments, such as whether some of the defendants have waived their right to arbitration or whether Giusti's arbitration clause is unreasonable, as these issues are moot in light of our holdings here.

. We also agree with the district court that the Receiver is not estopped from contesting the arbitrability of his claims against defendants Charles Rawl and Mark Tidwell. As the district court noted, although Stanford Group Company initiated arbitration proceedings against Rawl and Tidwell, that arbitration occurred before the appointment of the Receiver and involved claims and issues wholly distinct from those in the instant case.