[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11203

_____

D.C. Docket No. 8:10-cv-00181-EAK-MAP

BURTON W. WIAND,

Plaintiff - Appellant,

versus

ROBERTA SCHNEIDERMAN,
ROBERT ZIMELIS,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 10, 2015)

Before ED CARNES, Chief Judge, DUBINA and GILMAN,* Circuit Judges.

---

* Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

GILMAN, Circuit Judge:

In January 2009, Burton Wiand was appointed the receiver of six hedge funds that were part of a Ponzi scheme orchestrated by Arthur Nadel. Since that time, Wiand has been aggressively pursuing investors who made money in connection with Nadel's fraudulent scheme. His purpose is to recover these alleged "false profits" so that the excess proceeds can be redistributed to the investors who lost money. Herbert Schneiderman (now deceased) was among the investors who made money, and thus became subject to one of Wiand's "clawback" lawsuits.

The executors of Schneiderman's estate moved to compel arbitration based on arbitration clauses in the Limited Partnership Agreement and the Subscription Agreement that governed Schneiderman's investment in one of the six hedge funds in question. After the district court granted the motion and Wiand's attempt to pursue an interlocutory appeal failed, the parties proceeded to arbitration.

The arbitrator granted summary judgment to the estate and denied Wiand's motion for reconsideration. Wiand then filed a motion in federal district court to vacate the arbitrator's decision, which was denied. He now appeals both the district court's decision compelling arbitration and its denial of his motion to

2

vacate the arbitration award.  For the reasons set forth below, we AFFIRM the judgment of the district court.

## I.    BACKGROUND

Nadel, through his control of two investment-management companies, managed six hedge funds for approximately ten years, beginning around 1999.  As determined by the district court, all of the hedge funds were undercapitalized because, "[l]ike every Ponzi schemer, Nadel robbed Peter to pay Paul."  *In re Wiand,* No. 8:10-cv-71-T-17MAP, 2011 WL 4530203, at *3 (M.D. Fla. Sept. 29, 2011). The funds' cumulative net worth in 2009 was closer to $500,000 than to their reported value of hundreds of millions. Instead of earning profits as the investor account statements in 2008 and 2009 repeatedly stated, the hedge funds lost money.

The Securities and Exchange Commission (SEC) brought an emergency enforcement action in January 2009 against Nadel, his investment-management companies, and the six hedge funds connected with his scheme, contending that the defendants had violated Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934, and SEC Rule 10b-5.  In addition to seeking declaratory and injunctive relief, an asset freeze, disgorgement, and civil money penalties, the SEC moved for the appointment of a receiver to manage and

preserve all assets. The district court appointed Wiand as the receiver for the hedge funds.

Wiand has been charged with rounding up recoverable assets and redistributing them to those who came up short.  Since his appointment, he has filed more than 150 "clawback" lawsuits to recover false profits from hedge-fund investors. All of these cases lay out a similar scenario:  The investor received payouts from his or her investment that exceeded the amount of the intial investment (hence the claim of a "false profit").  These investors, Wiand contends, are to be distinguished from the larger group of investors who suffered net losses. To allow the winners to retain their false profits at the expense of the losers is claimed to be inequitable and unjust.

This case originated as one such "clawback" action.    In January 2010, Wiand—on behalf of the six hedge funds—filed suit against the estate of Herbert Schneiderman, who had invested $100,000 with Victory Fund, Ltd. (one of the six funds involved in Nadel's scheme).  Schneiderman eventually received payouts from the fund totaling $263,660.48, and Wiand sought to recover the $163,660.48 that Schneiderman earned as "profit."  The estate moved to compel arbitration based on the Subscription Agreement and Limited Partnership Agreement (collectively, "the contract") that Schneiderman had executed with Victory.  In

4

relevant part, the contract provides that any disputes or controversies that arise from the agreements must be submitted to arbitration.

After the district court granted the motion to compel arbitration, the parties proceeded to arbitrate before the American Arbitration Association's Commercial Arbitration Tribunal.  Arbitrator Steven M. Platau granted the estate's motion for summary judgment and entered a Final Order and Award (the Award) dismissing Wiand's claims as barred by the Florida probate statutes.  In the Award, he also denied Wiand's motion for a declaratory judgment that the agreements containing the arbitration clauses are void.

Wiand then filed a motion seeking to vacate the Award.  The assigned magistrate judge recommended denying the motion to vacate, and the district court adopted his recommendation in full.  Wiand subsequently filed this timely appeal of both the district court's decision to compel arbitration and its decision denying the motion to vacate.

## II.  ANALYSIS

We review de novo the district court's decision to compel arbitration.  *See Dale v. Comcast Corp.*, 498 F.3d 1216, 1219 (11th Cir. 2007).  The district court's findings of fact with respect to the denial of Wiand's motion to vacate the arbitrator's Award are reviewed under the clear-error standard, and its legal

5

conclusions are reviewed de novo. *See Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010).

Wiand presents a four-pronged attack on the district court's decision to send this case to arbitration and then to not set aside the resulting Award. First, he argues that the receivership statutes creating his position preclude the use of arbitration in clawback actions. Second, Wiand argues that even if clawback actions are subject to arbitration as a general matter, the contract containing the arbitration clauses at issue here is void—and thus unenforceable—from its inception. His third argument is that even if his claims are subject to arbitration and the contract is not void, the district court erred in sending all of his claims to arbitration, including those brought by entities with which Schneiderman had no agreement whatsoever. Finally, Wiand argues that even if each of the preceding arguments fails and the claims were properly subject to arbitration, the arbitrator so exceeded or imperfectly executed his powers that the district court erred in refusing to vacate the Award.

## A.    Clawback actions are not categorically exempt from the Federal Arbitration Act

The Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq., mandates that agreements to arbitrate be enforced unless "overridden by a contrary congressional command." *Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987). There is a "liberal federal policy favoring arbitration agreements," such that "any

doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). A party seeking to avoid arbitration thus bears the burden of demonstrating a contrary congressional command using a statute's text, its legislative history, or identifying an "inherent conflict between arbitration and the statute's underlying purposes." *Shearson*, 482 U.S. at 227.

Wiand argues that there is an inherent conflict between arbitration and the underlying purpose of 28 U.S.C. § 754. Section 754 vests a court-appointed receiver with "complete jurisdiction and control" of property that is contested in a civil case, including "the right to take possession thereof." 28 U.S.C. § 754. Wiand contends in his brief that Congress enacted this statute to "promote judicial efficiency by permitting courts to manage claims regarding receivership property in a single forum," which he says is the federal district court in which the receivership is based. He argues that this purpose is reinforced by the legislative history of § 754. The section was enacted (under a different code number) specifically to ease a then-existing restriction on receivers. Under the prior statutory scheme, a receiver appointed by a federal district court could bring claims related only to property that was physically located within that district, which made it difficult to resolve cases involving property in many different locations. *See Link v. Powell*, 57 F.2d 591, 593 (W.D.S.C. 1932).

7

Section 754 changed that by allowing receivers to take charge of all of the relevant property in a case, regardless of where it was located. *Id.* If Congress's intent was to consolidate all claims related to a particular set of property, Wiand contends, then that intention is inherently in conflict with an arbitration clause that can specify any forum agreed to by the parties. He thus argues that clawback actions pursued by a receiver should be exempted from the general obligation to arbitrate per the parties' contract.

In support of this argument, Wiand points out that courts have found inherent conflicts between arbitration and other statutory schemes designed to streamline the distribution of assets. When considering the use of arbitration in a bankruptcy case, for example, the Fourth Circuit concluded that Congress intended to centralize disputes about a debtor's assets and legal obligations in the bankruptcy courts, and that "[a]rbitration is inconsistent with centralized decision-making." *In re White Mountain Mining Co., LLC.*, 403 F.3d 164, 169 (4th Cir. 2005). Wiand also notes that at least one court has declined to send a claim arising under the Federal Credit Union Act (FCUA)—which was designed to "centraliz[e] the claims process and preserv[e] the limited assets of [a] defunct credit union"—to arbitration because it would place the rights of creditors with agreements containing arbitration clauses on a "different footing" than those who did not have such clauses. *Nat'l Credit Union Admin. Bd. v. Lorment Comm. Fed.*

8

*Credit Union*, 2010 WL 4806794, at *4 (N.D. Ohio Nov. 18, 2010) (unpublished). Because clawback actions by court-appointed receivers, like bankruptcy cases and actions under the FCUA, are designed to facilitate the equitable distribution of assets, Wiand argues that clawback actions also inherently conflict with the enforcement of arbitration clauses.

But Wiand's argument is fundamentally flawed because he mischaracterizes the statute on which he relies. Section 754 does not designate district courts as having complete jurisdiction and control of receivership properties as Wiand claims. It instead grants that control to a receiver who is appointed by the court. *See* 28 U.S.C. § 754 ("*A receiver* appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court*, be vested with complete jurisdiction and control* of all such property with the right to take possession thereof.") (emphases added). The jurisdiction mentioned in the statute, therefore, does not refer to the *district court*'s authority to decide all disputes relating to the contested property, but rather to the *receiver*'s right to take charge of all contested property regardless of its physical location. A receiver is granted this jurisdiction and control so that he can manage the full scope of the assets with legally binding authority.

Furthermore, neither the bankruptcy cases nor the FCUA cases indicate that there is any inherent conflict between arbitration and the receivership statutes.

Both the use of the bankruptcy courts and the administrative-claims process set up in the FCUA are methods by which one entity's assets may be distributed to a myriad of creditors who have a legitimate claim to them. A receiver, on the other hand, is the individual (or entity) responsible for the collection and management of those assets until they can be distributed; this role is analogous to a trustee in a bankruptcy case rather than to the bankruptcy-court system itself.

When a statute provides a special method for the resolution of a particular type of dispute, resolving that type of dispute elsewhere would indeed be contrary to the statute. *See, e.g.*, *In re White Mountain Mining Co., LLC.*, 403 F.3d at 169. In the case of receiverships, however, Congress has simply provided for a particular person or entity to manage the collection and distribution of the assets without establishing a special method by which that person or entity is to do so. This distinction eliminates from the instant case the inherent conflict that has been recognized by other courts between arbitration proceedings and the congressionally established methods for resolving specific disputes.

Finally, other courts that have dealt with receivers in securities litigation have referred the disputes to arbitration. *See, e.g.*, *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 627 (6th Cir. 2003) (holding that the receiver of two business entities could be compelled to arbitrate claims against brokerage firms that had invested the entities' money); *U.S. Small Business Admin. v. Coqui Capital Mgmt.,*

*LLC*, 2008 WL 4735234, at \*2 (S.D.N.Y. Oct. 27, 2008) (unpublished) (holding that the receiver of a business entity could be compelled to arbitrate claims against each of the entity's limited partners because the receiver was bound by the same arbitration clauses that would have bound the receivership entity). In light of this precedent, the "liberal federal policy" in favor of arbitration, and the distinctions noted above, we find that there is no inherent conflict between arbitration and the underlying purpose of court-appointed receivers pursuing clawback claims.

**B.    The district court did not err in determining that the parties formed a contract and that questions as to its validity were for the arbitrator to decide**

Wiand next argues that the arbitration clauses in question cannot be enforced because the contract of which they are a part never came into being and, if it did come into being, it is invalid as a matter of public policy. The courts recognize three distinct types of challenges to a contract containing an arbitration clause: (1) a challenge to the validity of the arbitration clause standing alone, (2) a challenge to the validity of the contract as a whole, and (3) a challenge to the very existence of the contract. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444-45 n.1 (2006) (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967)). Challenges to the validity of the contract as a whole are for the arbitrator to decide, whereas challenges to the validity of the arbitration clause in particular or to the very existence of the contract must be resolved by the

11

court before deciding a motion to compel arbitration.  *Id.*  Here, Wiand presents arguments challenging both the existence and the validity of the contract as a whole, but not the validity of the arbitration clause standing alone.

A party may challenge the existence of a contract by alleging that at least one party never agreed to its terms, that a signatory lacked the authority to commit his principal, or that the signor lacked the mental capacity to assent.  *Buckeye*, 546 U.S. at 444 n.1.  Wiand presents arguments under each of the first two theories.  He contends that Victory's assent was demonstrated neither by a written signature on the contract nor by any act or performance consistent with the contract's terms.  Wiand alternatively argues that because Victory's agents were part of a Ponzi scheme, they were acting adversely to the interests of their principal—the hedge fund itself—and therefore lacked the authority to bind Victory to the contract in question.

Schneiderman's compelling counterargument is that Victory acted in conformance with the terms of the contract, thereby binding itself to its terms. Wiand does not dispute that Schneiderman's initial investment was credited to his account, that his account reflected gains and losses, and that he received account statements and tax forms, just as the contract at issue indicated that he whould. Nor does Wiand dispute that a party may be bound by a contract where both parties

performed under its terms. *See Integrated Health Servs. of Green Briar, Inc. v. Lopez-Silvero*, 827 So. 2d 338, 339 (Fla. Dist. Ct. App. 2002).

Wiand instead argues that Victory's actions did not constitute performance under the contract because the profits reflected in the documents that Schneiderman received did not come from the sources claimed. But such an argument speaks to the manner of the contract's performance, not to its formation. *See, e.g.*, *Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc.,* 777 F.2d 1504, 1505-06 (11th Cir. 1985) (treating a payment made in compliance with a contract but from the wrong source as a breach of contract). Disputes regarding whether a contract was performed in accordance with its terms, like disputes about the validity of the contract as a whole, go to the arbitrator. *See Sims v. Clarendon Nat'l. Ins. Co.,* 336 F. Supp. 2d 1311, 1320 (S.D. Fla. 2004) ("Issues relating to the making and performance of a contract as a whole, not specific to the arbitration clause, are subject to arbitration.").

Wiand's remaining attacks on the contract—that it is *ultra vires*, that it violates public policy, that it was fraudulently procured, etc.—address the contract's validity and should also go to the arbitrator. *See Jenkins v. First Am. Cash Advance of Ga., LLC*, 400 F.3d 868, 881-82 (11th Cir. 2005) (dismissing a party's arguments that a contract containing an arbitration clause was illegal and void *ab initio* because such questions are for the arbitrator, not the court, to

13

decide).    In sum, the uncontested performance by both parties confirms the existence of a contract.    Having correctly determined that a contract had been formed, the district court did not err in sending the remaining questions, including those aimed at the contract's validity, to the arbitrator.

## C.    The district court did not err in sending all claims to arbitration

Wiand next argues that even if there is a valid and enforceable arbitration clause, it is binding only on Victory and not on the other five funds for which he servers as receiver.    Because the other funds did not enter into contracts agreeing to arbitrate with Schneiderman in this case, Wiand asserts that these other hedge funds cannot be forced into arbitration.    The flaw in Wiand's argument is the very fact that these other hedge funds have no relationship at all with Schneiderman.    Only Victory made a transfer of funds to Schneiderman.    Under the Florida Statutes that Wiand cites in his complaint, the other funds' right to any part of Schneiderman's false profits is therefore completely derivative from whatever right Victory might have to recover from the estate.    Wiand cites no decisions that would provide these other hedge funds with standing to bring their own, stand-alone claims.    We therefore join the district court in concluding that this argument is without merit.

14

**D.    The arbitrator did not so exceed or imperfectly use his powers that the district court erred in declining to vacate the Award**

As a last resort, Wiand argues that even if all his claims were properly sent to arbitration, the district court erred in refusing to vacate the arbitrator's Award. Wiand bears the heavy burden of demonstrating that vacatur is appropriate, *see Brown v. ITT Consumer Fin. Corp.,* 211 F.3d 1217, 1223 (11th Cir. 2000), by proving the existence of one or more of four statutorily enumerated causes for reversal set forth in 9 U.S.C. § 10(a)(1)-(4). The first three factors concern the presence of corruption, bias, fraud, or misconduct, none of which is at issue here. Wiand relies solely on the fourth factor, which permits reversal "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).

"There is a presumption under the FAA that arbitration awards will be confirmed, and federal courts should defer to an arbitrator's decision whenever possible." *Frazier v. CitiFinancial Corp.*, *LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010) (internal quotation marks omitted). As set forth in *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013),

> [i]t is not enough to show that the arbitrator committed an error—or even a serious error. . . .  Only if the arbitrator acts outside the scope of his contractually delegated authority—issuing an award that simply reflects his own notions of economic justice rather than drawing its essence from the contract—may a court overturn his determination.

15

*Id.*at 2068 (internal quotation marks, citations, and alterations omitted).

In this case, Wiand argues for vacatur based on the arbitrator exceeding his authority or so imperfectly executing his authority that a mutual, final, and definite award was not made. *See* 9 U.S.C. § 10(a)(4).  He contends that the arbitrator's Award was not "reasoned," and that the arbitrator's summary-judgment decision was "based on no evidence."  He urges us to reverse the arbitrator's Award just as we would reverse an erroneous summary-judgment order by a district court.

The applicable standards of review, however, could not be more different. Summary-judgment orders from a district court are subject to de novo review. *Chapman v. AI Transp*., 229 F.3d 1012, 1023 (11th Cir. 2000).  When reviewing an arbitration award, on the other hand, we may revisit neither the legal merits of the award nor the factual determinations upon which it relies.  *See United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc*., 484 U.S. 29, 39 (1987) (prohibiting judicial review despite the arbitrator having made "improvident, even silly" decisions); *Scott v. Prudential Sec., Inc.*, 141 F.3d 1007, 1017 (11th Cir. 1998) (holding that a court will not reverse an arbitrator's award unless a plausible ground for the arbitrator's decision cannot be inferred from the facts of the case).

Wiand's entire argument for vacatur is based on the weight of the evidence presented, and that is simply beyond this court's—or the district court's—power to

16

review.    The district court thus did not err in allowing the arbitrator's Award to stand.

## III.    CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.