[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11513
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cv-02861-ELR

ORIGINAL APPALACHIAN ARTWORKS, INC.,

Plaintiff-Appellee,

versus

JAKKS PACIFIC, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(November 17, 2017)

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

Defendant JAKKS Pacific, Inc. ("Defendant") appeals the district court's confirmation of an arbitration award and denial of Defendant's motion to partially vacate that award.  After careful review, we affirm.

## I.    BACKGROUND

### A.    Factual and Procedural History

Plaintiff Original Appalachian Artworks, Inc. ("Plaintiff") owns the Cabbage Patch Kids brand and related intellectual property.  It licenses those assets to others who manufacture and sell Cabbage Patch Kids dolls and accessories.  Relevant to this appeal, Plaintiff licensed the Cabbage Patch Kids brand to Defendant pursuant to two license agreements:  an international agreement effective January 1, 2012, and a domestic agreement effective January 1, 2013.  Both agreements expired by their terms on December 31, 2014.

Under those agreements, Defendant had an exclusive license to use the Cabbage Patch Kids brand and related intellectual property in connection with "the manufacture (including the right to have manufactured), importation, sale, advertising, promotion, shipment and distribution" of Cabbage Patch Kids dolls.  That license extended to the packaging, labels, catalogs, displays, and advertising and promotional signage created for use in connection with the manufacturing or distribution of Cabbage Patch Kids dolls.  Defendant also had an exclusive license

2

"to prepare, or commission the preparation of, derivative works based on" the Cabbage Patch Kids brand.

In May 2014, before Defendant's license expired, Plaintiff selected a new licensee, Wicked Cool Toys, to manufacture and sell Cabbage Patch Kids dolls and products beginning in 2015, after Defendant's license expired. To that end, Plaintiff and Wicked Cool Toys entered into a deal memorandum on May 30, 2014. Plaintiff then permitted Wicked Cool Toys to immediately begin the process of creating a new line of Cabbage Patch Kids dolls to be manufactured and launched in 2015, and to promote that new line at industry trade shows and in discussions with retailers.

In a series of August 2014 letters between Plaintiff and Defendant, Defendant asserted that Plaintiff had breached its exclusive license. In support of that assertion, Defendant pointed to a provision in the license agreements reserving to Plaintiff the right to "engage, during the 365-day period prior to the termination or expiration of th[e agreements], in the negotiation, with potential licensees (including competitors of Licensee), of one or more license agreements granting licenses with respect to" the products covered by Defendant's exclusive license, "to become effective upon the expiration or earlier termination of th[e agreements]." Defendant argued that, under that provision, Plaintiff could only "negotiate" with potential licensees in 2014, and was prohibited from actually

3

reaching an agreement with a new licensee or doing anything else to make it possible for a new licensee to actually launch a new line of Cabbage Patch Kids products in 2015.

In response, Plaintiff contended that the license agreements did not purport to grant Defendant exclusivity with respect to the types of activities that Wicked Cool Toys engaged in, which Plaintiff characterized as design and development activities preliminary to the manufacturing and launch of a new line of Cabbage Patch Kids dolls in 2015.  Plaintiff also pointed to another provision in the license agreements, which provided that, for 120 days after expiration of the agreements, Defendant had a non-exclusive right to sell Cabbage Patch Kids products that it either had on hand or was in the process of manufacturing.  Plaintiff noted that, given the nature of the toy industry, a successor licensee could never introduce a new line of Cabbage Patch Kids dolls within 120 days after expiration of the license agreements unless it were permitted to engage in some preliminary or preparatory activities in 2014.

The license agreements also contained an arbitration clause.  In September 2014, Plaintiff filed a complaint in the district court seeking an order compelling arbitration and confirmation of any arbitration award.[1]  In an attached notice of

---

[1]  The district court had diversity jurisdiction under 28 U.S.C. § 1332.  *Cf. Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 841 n.7 (11th Cir. 2011) ("While the [Federal Arbitration Act]

4

arbitration, Plaintiff sought an award from the arbitrator declaring that it had not breached the license agreements.  Shortly thereafter, the parties voluntarily proceeded to arbitration and the district court stayed the case.  Believing Plaintiff to be in breach of the license agreements, Defendant stopped paying royalties for its continued use of the Cabbage Patch Kids brand.

In January 2016, the arbitrator concluded that Plaintiff had not breached the license agreements.  The arbitrator further concluded, in the alternative, that even if Plaintiff had breached the agreements, its breaches were not material.  The arbitrator ordered Defendant to pay $1,117,559 in unpaid royalties.  The parties then returned to the district court, where Defendant filed a motion to partially vacate the award, and Plaintiff filed a motion to confirm the award.  The district court denied Defendant's motion, granted Plaintiff's motion, and confirmed the award.

### B.    The Arbitrator's Award

In analyzing whether Plaintiff had breached its license agreements with Defendant, the arbitrator determined that the "key term" relating to what conduct Plaintiff could engage in before the agreements expired was the provision

---

provides the grounds for vacatur of an arbitration award, it does not serve as an independent ground for jurisdiction in federal courts.").

5

reserving to Plaintiff the right to engage, in 2014, in the negotiation of a new

license agreement to become effective in 2015.  That provision stated as follows:

> The Doll License granted pursuant to this Section I shall be exclusive for the Licensed Doll Products in the Licensed Territories through the Licensed Distribution Channels.  Notwithstanding the foregoing, [Plaintiff] reserves for itself the right[] to . . . engage, during the 365-day period prior to the termination or expiration of this Agreement, in the negotiation, with potential licensees (including competitors of Licensee), of one or more license agreements granting licenses with respect to the Licensed Doll Products covering the Licensed Territories and the Licensed Distribution Channels to become effective upon the expiration or earlier termination of this Agreement.

The arbitrator acknowledged that, "[r]ead literally, without examination of

context, that provision appears to provide what [Defendant] says it provides:

[Plaintiff could] only negotiate a new license in 2014 and not do one thing more to

obtain a new licensee until the onset of the new year."  However, the arbitrator

concluded that the provision was ambiguous in light of the circumstances,

particularly the undisputed commercial reality that, without some preparatory

activities in 2014, a successor licensee would not be able to sell any Cabbage Patch

Kids dolls in 2015.[2]  Finding no evidence to support Defendant's contention that

the parties had intended such a result when they executed the agreements, the

arbitrator turned to Georgia's rules of contract construction to give meaning to the

---

[2]  This is because retailers often make arrangements for the utilization of their shelf and display space more than a year in advance.

6

provisions at issue, particularly the scope of Plaintiff's right to engage in the negotiation of a new license agreement to become effective in 2015.

The arbitrator ultimately concluded that "it was the intention of the parties" that Plaintiff and Wicked Cool Toys, as successor licensee, "could do what they did in order to transition into the manufacture and launch in 2015 of a new seasonal line of [Cabbage Patch Kids] products, without the de facto creation of a 'gap' of about one year." He reasoned that "[i]t was fair to assume [both] that a successor license could be concluded in 2014, during the pendency of" Defendant's license agreements, and "that the successor licensee would need to build trade awareness of its accession to the role of licensee and of the products it intended to offer."

In the alternative, the arbitrator also concluded that, even if Plaintiff had breached the license agreements, its breaches were not material "in the context of the totality of operations under the" license agreements and "relative to the financial and branding effects and results of the parties' long-term performance."

## II.    DISCUSSION

### A.    Standard of Review

"We review confirmations of arbitration awards and denials of motions to vacate arbitration awards under the same standard, reviewing the district court's findings of fact for clear error and its legal conclusions *de novo*." *Frazier v.*

7

*CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010).  "Because arbitration is an alternative to litigation, judicial review of arbitration decisions is among the narrowest known to the law."  *AIG Baker Sterling Heights, LLC v. Am. Multi–Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (quotation omitted).  "[C]onvincing a court of an arbitrator's error—even his grave error—is not enough" to justify vacatur.  *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2070 (2013).  Rather, a party seeking to vacate an arbitrator's award has the burden of establishing the existence of a specific statutory ground for vacatur.  *Frazier*, 604 F.3d at 1324; *Greene v. Hundley*, 468 S.E.2d 350, 353 n.24 (Ga. 1996).

The district court analyzed Defendant's motion to partially vacate the arbitrator's award under both the Georgia Arbitration Code, O.C.G.A. § 9-9-13, and the Federal Arbitration Act, 9 U.S.C. § 10.  We do the same.[3]

---

[3]  Because the outcome in this case does not depend upon whether we utilize the Federal Arbitration Act's standard for vacating an arbitration award or the Georgia Arbitration Code's standard, we do not decide whether the choice-of-law provisions in Defendant's license agreements are sufficient to invoke review under the Georgia Arbitration Code, assuming that the parties could contract for such review in federal court. *Cf. Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 584–91 (2008) (holding that the parties to an arbitration agreement could not contract for broader review than that provided in 9 U.S.C. §§ 10 and 11 where the Federal Arbitration Act had provided the basis for the district court's review of the arbitration award, but indicating that courts might engage in broader review if the parties contemplated enforcement of the award under state statutory or common law); *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340–43 (5th Cir. 2004) (holding that a general choice-of-law provision did not express the parties' clear intent to depart from the Federal Arbitration Act's vacatur standard).

8

**B.    Vacatur under the Georgia Arbitration Code**

The Georgia Arbitration Code provides several bases for vacating an arbitrator's award.  O.C.G.A. § 9-9-13(b).  The only grounds raised by Defendant on appeal are that the arbitrator manifestly disregarded the law and overstepped his authority.  *See* O.C.G.A. § 9-9-13(b)(3), (5).[4]

1.    Manifest Disregard of the Law under O.C.G.A. § 9-9-13(b)(5)

Defendant argues that the arbitrator manifestly disregarded Georgia's parol evidence rule when he considered extrinsic evidence of the commercial context in which the license agreements were executed in determining whether the provision allowing Plaintiff to engage in the negotiation of a new license agreement in 2014 was ambiguous.[5]  Defendant contends that, once the arbitrator determined that the literal language of the license agreements "appear[ed] to provide" that Plaintiff could "only negotiate a new license in 2014 and not do one thing more to obtain a new licensee until the onset of the new year," he was required to end his inquiry into the intentions of the parties and enforce the contract as written.

---

[4]  Under the Georgia Arbitration Code, a court must vacate an arbitrator's award if it finds that the moving party's rights were prejudiced by (1) "[a]n overstepping by the arbitrators of their authority or such imperfect execution of it that a final and definite award upon the subject matter submitted was not made"; or (2) "[t]he arbitrator's manifest disregard of the law."  O.C.G.A. § 9-9-13(b)(3), (5).

[5]  The license agreements contained a choice-of-law provision providing that the agreements were governed by and should be construed in accordance with Georgia law.  Under Georgia law, the general rules of contract construction apply in arbitration proceedings.  *Sweatt v. Int'l Dev. Corp.*, 531 S.E.2d 192, 194 (Ga. Ct. App. 2000).

9

To prevail on this claim of error, Defendant must point to "concrete evidence" of the arbitrator's intent to purposefully disregard the law. *ABCO Builders, Inc. v. Progressive Plumbing, Inc.*, 647 S.E.2d 574, 576 (Ga. 2007). "[T]here must be something beyond and different from mere error in law or failure on the part of the arbitrator[] to understand or apply the law; it must be demonstrated that the [arbitrator] deliberately disregarded the law in order to reach the result [he] did." *Id.* (first alteration in original) (quotation omitted). It is not enough to show that the correct law was communicated to the arbitrator. *Id.* at 575. Rather, the party seeking to vacate the award must show that "the arbitrator appreciated the existence of a clearly controlling legal principle and deliberately chose to ignore it." *Patterson v. Long*, 741 S.E.2d 242, 246 (Ga. Ct. App. 2013); *see also ABCO Builders*, 647 S.E.2d at 575 (explaining that a party moving to vacate an arbitration award on account of the arbitrator's manifest disregard of the law must provide evidence that the arbitrator was both "conscious of the law" and "intentionally and knowingly chose to ignore" it (quotation omitted)).[6]

---

[6] To illustrate just how difficult it is to make a showing that an arbitrator has manifestly disregarded the law, the Georgia Supreme Court in *ABCO Builders* pointed to this Court's opinion in *Montes v. Shearson Lehman Bros.*, 128 F.3d 1456 (11th Cir. 1997). *ABCO Builders*, 647 S.E.2d at 575. In that case, this Court concluded that an arbitration panel manifestly disregarded the law where (1) the winning party had explicitly urged the arbitrators to disregard the law; (2) the arbitration award recited the winning party's argument that the law should be disregarded; (3) the record reflected that the arbitrators knew the law and recognized that they were told to disregard it; (4) nothing in the record refuted the inference that the arbitrators did as the winning party had urged them to do; and (5) the evidence in support of the award was marginal. *Montes*, 128 F.3d at 1459, 1461–62. Under Georgia law, "similarly clear evidence of

Defendant has not met this burden.  The record reveals that Defendant communicated the correct rule to the arbitrator, but that is not enough.  *ABCO Builders*, 647 S.E.2d at 575–76; *Patterson*, 741 S.E.2d at 246.  Defendant must also show that the arbitrator had the "specific intent to disregard" it.  *ABCO Builders*, 647 S.E.2d at 576.

Although one iteration of the parol evidence rule is contained within one of the block quotations of Georgia contract law included in the arbitrator's award, the arbitrator never discussed the rule either in the award or at the hearing.  It is evident from both the award and the transcript of the arbitration hearing that the arbitrator was primarily concerned with ascertaining the extent to which the parties had intended the various provisions of the license agreements to limit Plaintiff's ability to effectively transition to a new licensee when the agreements expired.  Consistent with that approach, the arbitrator's award quotes extensively from Georgia cases indicating that the overarching purpose of contract construction is to ascertain the intent of the parties and to give the contract that meaning which will best carry into effect their intent.

From this record, and assuming that the arbitrator incorrectly applied the parol evidence rule, it is just as plausible that the arbitrator simply made a mistake

---

the arbitrator's intent to purposefully disregard the law is required." *ABCO Builders*, 647 S.E.2d at 575–76.

11

in interpreting, understanding, or applying that rule as it is that he manifestly disregarded it. Because an arbitrator's mere failure to apply the law is insufficient to show manifest disregard, Defendant has not met its burden to show that the award should be vacated on account of the arbitrator's manifest disregard of Georgia's parol evidence rule. *See ABCO Builders*, 647 S.E.2d at 575–76; *Patterson*, 741 S.E.2d at 246–50.

Defendant also argues that the arbitrator manifestly disregarded the rule that ambiguous contracts are to be interpreted against the drafter. However, in refusing to strictly adhere to that rule, the arbitrator, quoting a Georgia Court of Appeals opinion, reasoned that the rule should not be applied piecemeal to each provision in the contract, and that the contract should instead be considered in its entirety and in such a way as to "ascertain the true intention of the parties." It is evident, therefore, that the arbitrator did not simply and deliberately ignore a rule that he knew to be controlling. Rather, the arbitrator analyzed Georgia law and concluded that the rule was not controlling in this case. Accordingly, Defendant has shown, at most, that the arbitrator may have made a legal error. Again, such a showing is insufficient to establish that the award should be vacated on the ground that the arbitrator manifestly disregarded the law. *See ABCO Builders*, 647 S.E.2d at 575–76; *Patterson*, 741 S.E.2d at 246–50.

12

### 2.    Oversteppping Authority under O.C.G.A. § 9-9-13(b)(3)

"A court will vacate an arbitrator's award on the basis that the arbitrator overstepped his or her authority only where the arbitrator determines matters beyond the scope of the case and addresses issues not properly before him or her." *Brookfield Country Club, Inc. v. St. James-Brookfield, LLC*, 683 S.E.2d 40, 45 (Ga. Ct. App. 2009), *aff'd*, 696 S.E.2d 663 (Ga. 2010); *see also Progressive Data Sys., Inc. v. Jefferson Randolph Corp.*, 568 S.E.2d 474, 475 (Ga. 2002) (declaring that an arbitrator oversteps his authority only when he "determines matters beyond the scope of the case").  Nevertheless, "the arbitrator may not ignore the plain language of the parties' contract."  *Southwire Co. v. Am. Arbitration Ass'n*, 545 S.E.2d 681, 684 (Ga. Ct. App. 2001).  In reviewing the arbitrator's decision, however, "courts must not decide the rightness or wrongness" of the arbitrator's contract interpretation, only whether his decision "draws its essence from the contract."  *Id.* (quotations omitted).  So long as the contract provides "arguable support" for the arbitrator's decision, the arbitrator did not overstep his authority. *See id.*

Two Georgia Court of Appeals opinions illustrate the difference between an arbitrator's overstepping of his authority by ignoring the plain language of the contract and mere contract interpretation.  First, in *Sweatt v. International Development Corp.*, the Georgia Court of Appeals held that an arbitrator

13

overstepped his authority when he awarded a party actual damages despite a liquidated damages clause in the relevant contract. 531 S.E.2d 192, 195–96 (2000). Indeed, because the contract specifically provided for only liquidated damages, the Georgia Court of Appeals concluded that "the calculation of actual damages was a matter not properly submitted" to the arbitrator. *Id.* at 196.

By contrast, in *Brookfield Country Club, Inc. v. St. James-Brookfield, LLC*, the Georgia Court of Appeals held that an arbitrator did not overstep her authority when she concluded that, because the owner of a golf course had not obtained a permit to draw water from a lake on the course, it had breached a lease agreement in which it warranted that it owned all "water rights and powers" appurtenant to the course. 683 S.E.2d at 41–43, 45. In seeking to vacate the arbitrator's award, the owner argued that "the effect of the arbitrator's ruling was to add a term to the warranties of title." *Id.* at 45. The owner further argued that, because the lease agreement limited the arbitrator to applying "the strict terms" of the agreement, the arbitrator had overstepped her authority in reading an additional term into the lease. *Id.* The Georgia Court of Appeals rejected these arguments, reasoning that, because the subject of the arbitration proceeding was the parties' dispute about "the construction, meaning or enforceability of the terms of the lease, and the arbitrator resolved that dispute in her award, [the owner had] not shown that the arbitrator addressed an issue not properly before her." *Id.*

14

This case is more similar to *Brookfield* than it is to *Sweatt*. Here, the subject of the arbitration proceeding was the parties' dispute about the construction, meaning, or enforceability of certain terms in Defendant's license agreements. The arbitrator concluded that the provision allowing Plaintiff to engage in the negotiation of a new license agreement to become effective upon the expiration of Defendant's license agreements provided Plaintiff with more than the right to engage in mere "commercial discussions" with a potential licensee. Instead, the arbitrator concluded, that provision allowed Plaintiff to actually reach an agreement in 2014 for a new license to become effective in 2015, and to engage in certain limited activities in 2014 that would ensure that it was possible for the new licensee to launch a new line of Cabbage Patch Kids dolls in 2015. It was the arbitrator's job to decide what that provision meant, and it is not our job to "decide the rightness or wrongness" of the arbitrator's interpretation. *See Southwire*, 545 S.E.2d at 684 (quotation omitted). This is not a case like *Sweatt*, where the arbitrator decided a matter that was not properly before him. *See Sweatt*, 531 S.E.2d at 195–96. Accordingly, Defendant has not shown that the arbitrator overstepped his authority for purposes of O.C.G.A. § 9-9-13(b)(3).

### C.    Vacatur under the Federal Arbitration Act

The Federal Arbitration Act provides several bases for vacating an arbitrator's award.  9 U.S.C. § 10(a).  The only ground raised by Defendant on appeal is that the arbitrator exceeded his powers under § 10(a)(4).[7]

In determining whether an arbitrator has exceeded his powers, two principles guide us.  *Wiregrass Metal Trades Council v. Shaw Envtl. & Infrastructure, Inc.*, 837 F.3d 1083, 1087 (11th Cir. 2016).  First, "we must defer entirely to the arbitrator's interpretation of the underlying contract no matter how wrong we think that interpretation is."  *Id.*  The Supreme Court has instructed that "an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits."  *Sutter*, 133 S. Ct. at 2068 (quotation omitted).  That means "the sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong."  *Id.*  If we determine that the arbitrator even arguably interpreted the parties' contract, we must end our inquiry and deny a motion for vacatur.  *Wiregrass Metal*, 837 F.3d at 1088.

The second principle guiding our decision is that "an arbitrator may not ignore the plain language of the contract."  *Id.* (quotations omitted).  "That means

---

[7]  Under the Federal Arbitration Act, we may vacate an arbitration award if the arbitrator "exceeded [his] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).

16

an arbitrator may not issue[ ] an award that contradicts the express language of the agreement." *Id.* (alteration in original) (quotation omitted). "It also means that an arbitrator may not modify clear and unambiguous contract terms." *Id.*

Applying these two principles, an arbitrator acts within his authority when he even arguably interprets a contract, and he exceeds his authority when he modifies the contract's clear and unambiguous terms. *Id.* "To determine whether the arbitrator engaged in interpretation, as opposed to modification, we begin by looking at the relevant language in the [contract] and asking, as a threshold matter, whether that language is open to interpretation." *Id.* at 1088. If the language is open to interpretation, we must then determine whether the arbitrator engaged in interpretation or modification of that language. *See id.* at 1090. If it is not apparent from the arbitrator's stated reasoning whether he permissibly interpreted a contract or impermissibly modified it, and one can plausibly read the award either way, we must resolve the ambiguity by finding that the award is an interpretation of the contract and enforcing it. *Id.* at 1091–92.

1.    The negotiation provision is open to interpretation because it is ambiguous on its face

We conclude that the provision reserving to Plaintiff the right to "engage," in 2014, "in the negotiation . . . of one or more license agreements . . . to become effective" in 2015 is "sufficiently ambiguous" on its face as to allow for

17

interpretation by the arbitrator.[8] *See Wiregrass Metal*, 837 F.3d at 1088 (explaining that contract language is susceptible to an arbitrator's interpretation "when it is sufficiently ambiguous on its face or [w]hen there are two plausible interpretations of an agreement." (alteration in original) (quotations and citations omitted)); *Mariner Healthcare, Inc. v. Foster*, 634 S.E.2d 162, 168 (Ga. Ct. App. 2006) (concluding that a promise that the terms and conditions of a previous lease would continue so long as the parties "continued to negotiate" the terms of a new lease was vague because "the parties did not attempt to define what would constitute continuing to negotiate").  That provision could plausibly be read to reserve only the right to engage in preliminary discussions about a contemplated agreement—as Defendant contends—or to reserve the right to both (1) engage in preliminary discussions, and (2) actually reach the agreement contemplated by the provision.  *See, e.g.*, *Negotiation*, Black's Law Dictionary (10th ed. 2014) (defining "negotiation" as, among other things "[d]ealings conducted between two or more parties for the purpose of reaching an understanding"); Webster's Third New International Dictionary, Unabridged 1514 (1993) (defining "negotiation" as

---

[8]  Because we conclude that the negotiation provision is ambiguous on its face, we do not address the level of deference to be afforded to an arbitrator's determination that a particular provision is ambiguous when a court is assessing ambiguity for purposes of determining whether the arbitrator exceeded his powers under 9 U.S.C. § 10(a)(4). *Cf. Boise Cascade Corp. v. United Steelworkers Local 7001*, 588 F.2d 127, 129 (5th Cir. 1979) (concluding that a district court erred in vacating an arbitrator's award on the ground that the arbitrator had exceeded his authority based on language that the district court believed was unambiguous because the arbitrator's determination that the language was ambiguous could not "be said to have no foundation in reason or fact").

18

"the action or process of negotiating or of being negotiated," and defining

"negotiate" as, among other things, "to arrange for or bring about through

conference and discussion" or to "work out or arrive at or settle upon by meetings

and agreements or compromises"); *see also Negotiate*, Black's Law Dictionary

(10th ed. 2014) (defining "negotiate" as, among other things, "[t]o bring about by

discussion or bargaining").

Defendant contends that the arbitrator "recognized that the literal language

of the License is not ambiguous" when he stated that, "[r]ead literally, without

examination of context," the negotiation provision "appears to provide what

[Defendant] says it provides:  [Plaintiff could] only negotiate a new license in 2014

and not do one thing more to obtain a new licensee until the onset of the new

year."  We do not read the arbitrator's statement as a conclusion that the bare

language of the negotiation provision is not ambiguous.  Rather, we read that

statement as an acknowledgement by the arbitrator that Defendant's construction

of that provision had some initial intuitive appeal apart from any careful

consideration of either the language of the provision or its relationship to the other

terms of the agreement.

2.    The arbitrator arguably interpreted the negotiation provision

Having determined that the negotiation provision is at least open to

interpretation, the next question is whether the arbitrator did interpret it.  *See*

19

*Wiregrass Metal*, 837 F.3d at 1090. "In many cases, courts determine whether an arbitrator engaged in interpretation, as opposed to modification, by looking at the arbitrator's reasoning." *Id.* If the reasoning shows that the arbitrator "engaged in a textual analysis of the relevant terms" or "attempted to give meaning to express terms—or discover implied terms—based on extrinsic evidence of the parties' intent," that will ordinarily mean the arbitrator engaged in interpretation, not modification. *Id.*

Here, the arbitrator's reasoning reveals that he attempted to give meaning to the negotiation provision based on extrinsic evidence of the parties' intent. Noting that, without some preparatory activities in 2014, a successor licensee would not be able to sell any Cabbage Patch Kids dolls in 2015, the arbitrator concluded that the negotiation provision reserved to Plaintiff the right to reach an agreement with a new licensee in 2014 and to take the limited steps necessary to ensure that it was possible for the new licensee to launch a new line of Cabbage Patch Kids dolls in the year that its license became effective.

By attempting to give meaning to the negotiation provision, the arbitrator arguably interpreted the license agreements. Therefore, the arbitrator did not exceed his powers under 9 U.S.C. § 10(a)(4).[9] *Sutter*, 133 S. Ct. at 2068 ("[T]he

---

[9] Even if the arbitrator made an error of law in interpreting the license agreements, such as by failing to properly apply Georgia's rules of contract construction, that is not a basis for vacating the award under the Federal Arbitration Act. *See* 9 U.S.C. § 10(a); *Sutter*, 133 S. Ct. at 2068

sole question for us is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong."); *Wiregrass Metal*, 837 F.3d at 1088 ("If we determine that the arbitrator (even arguably) interpreted the parties' contract, we must end [our] inquiry and deny . . . a motion for vacatur." (alterations in original) (quotations omitted)).

### D.    Sufficiency of the Evidence

The arbitrator also concluded, in the alternative, that even if Plaintiff had breached the license agreements, its breaches were not material "in the context of the totality of operations under the" license agreements and "relative to the financial and branding effects and results of the parties' long-term performance." Defendant argues that there was no evidence to support this conclusion.  However, we may not vacate an arbitrator's award for mere insufficiency of the evidence. *Wiand v. Schneiderman*, 778 F.3d 917, 926 (11th Cir. 2015) (declaring that this Court lacks power to review whether the "weight of the evidence presented" supported the arbitrator's decision, and rejecting an appellant's argument that the arbitrator's decision should be vacated because it was "based on no evidence"); *ABCO Builders*, 647 S.E.2d at 575 ("An appellate court will not consider the sufficiency of the evidence underlying an arbitrator's award."); *Greene*, 468 S.E.2d

---

("So long as an arbitrator makes a good faith attempt to interpret a contract, even serious errors of law or fact will not subject his award to vacatur." (quotations omitted)); *Ainsworth v. Skurnick*, 960 F.2d 939, 940 (11th Cir. 1992) ("Courts are generally prohibited from vacating an arbitration award on the basis of errors of law or interpretation . . . .").

21

at 354 ("[A] reviewing court is prohibited from weighing the evidence submitted before the arbitrator, regardless of whether the court believes there to be sufficient evidence, or even any evidence, to support the award.").

## III.    CONCLUSION

For the reasons set forth above, we **AFFIRM** the judgment of the district court.